Stanley Goff, Bar No. 289564
15 Boardman Place Suite 2
San Francisco, CA 94103
Telephone: (415) 571-9570
Email: scraiggoff@aol.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLINE DYER, HUNTER SANDAVOL On behalf of themselves and other similarly situated individuals, | CASE NO. |
| Plaintiffs, | COMPLAINT FOR DAMAGES |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO POLICE CHIEF WILLIAM "BILL' SCOTT, MICHAEL MCEACHERN, SHAW #622, RICHINS # 753, OLSON # 4051, CURRY # 585, CHEA #41, KORTE # 4031, CHIN# 188 and DOES 1-50 | PLAINTIFFS DEMAND A JURY TRIAL |
| Defendants. | |

**INTRODUCTION**

1. On Monday, May 25, 2020, George Floyd was murdered by an officer of the Minneapolis Police Department. Mr. Floyd's arrest and murder were captured on video by multiple bystanders. The videos showed Mr. Floyd pinned on the street, face down and increasingly unresponsive, and informing officers that he could not breathe. while MPD Officer Derek Chauvin knelt on Mr. Floyd's upper back and neck. Other officers stood by watching Mr. Floyd die without attempting to intervene. All four officers were fired, and Minnesota's Attorney General brought charges of murder against the officers. Further Dereck Chauvin was ultimately convicted of the charges brought against him and sentenced to 22.5 years in prison.

2. Protests all over the United States erupted in response to this brutality and continued as violent police responses to protestors gave rise to new and further demonstrations, which in turn were met with more violence from the police.

3. Protests first occurred in San Francisco on May 30, 2020, and demonstrations continued through the following months. Thousands of citizens protested in the streets in solidarity with the Black Lives Matter movement.

4. However, the San Francisco Police Department unjustifiably declared these lawful protests "unlawful assemblies" so as to deter further civilian participation in the protests and to set the stage for their illegal use of force. At the direction of the Chief of Police, SFPD shifted almost immediately to the use of violent riot control tactics without regard for the safety and constitutional rights of those assembled. These tactics have included the widespread and indiscriminate use of teargas against nonviolent protestors without audible warning, and the use of less-lethal munitions such as sting ball grenades, pocket grenades, 40 mm projectiles of

various application, and rubber bullets in methods which resulted in unjustifiable risk of serious injury.

5. The use of these tactics continued despite clear reports of protestors having been maimed and suffering serious injuries. At best, this conduct demonstrated indiscriminate firing into crowds of innocent people and using other excessive uses of force; at worst it represented something far more sadistic.

6. SFPD's actions, moreover, were in violation of the department's own policy and procedures and/or caused by the omission of needed policies and procedures.

## PARTIES

7. Plaintiff Hunter Sandoval, was at all times relevant to this complaint, living in the City and County of San Francisco, which is located within the Northern District of California.

8. Plaintiff Caroline Dyer, was at all times relevant to this complaint, living in the City and County of San Francisco, which is located within the Northern District of California.

9. Defendant City and County of San Francisco is a municipal corporation, duly organized and existing under the laws of the State of California and is the employer of the Chief of Police of the San Francisco Police Department, and the identified and to-be-identified individual officers who carried out the acts and omissions complained of herein.

10. At all material times, the City and County of San Francisco was responsible for supervising, enacting, and enforcing SFPD's conduct, policies, and practices; the absence of needed policies and practices; and for the hiring, retention, supervision, and training of employees and agents of SFPD.

11. At all material times herein, Defendant William "Bill" Scott was employed by Defendant City and County of San Francisco as the Chief of Police and was acting within the course and scope of that employment. He is being sued in his individual and official capacities as San Francisco's Chief of Police. At all material times, Chief Scott was the final policymaking official for SFPD, and was ultimately responsible for all policies, procedures or omission of procedures, supervision, and training of SFPD. At all material times, Defendant Scott acted under color of law.

12. At all material times herein, Defendant Shaw #622 was employed by Defendant City and County of San Francisco as a police officer, and was acting within the course and scope of that employment, and under color of law. He is being sued in his individual capacity.

13. At all material times herein, Defendant Michael McEachern was employed by Defendant City and County of San Francisco as a police officer, and was acting within the course and scope of that employment, and under color of law. He is being sued in his individual capacity.

14. At all material times herein, Defendant Richins # 753 was employed by Defendant City and County of San Francisco as a police officer, and was acting within the course and scope of that employment, and under color of law. He is being sued in his individual capacity.

15. At all material times herein, Defendant Olson # 4051 was employed by Defendant City and County of San Francisco as a police officer, and was acting within the course and scope of that employment, and under color of law. He is being sued in his individual capacity.

16. At all material times herein, Defendant Curry # 585 was employed by Defendant City and County of San Francisco as a police officer, and was acting within the course and scope of that employment, and under color of law. He is being sued in his individual capacity.

17. At all material times herein, Defendant Chea # 41 was employed by Defendant City and County of San Francisco as a police officer, and was acting within the course and scope of that employment, and under color of law. He is being sued in his individual capacity.

18. At all material times herein, Defendant Korte # 4031 was employed by Defendant City and County of San Francisco as a police officer, and was acting within the course and scope of that employment, and under color of law. He is being sued in his individual capacity.

19. At all material times herein, Defendant Chin # 188 was employed by Defendant City and County of San Francisco as a police officer, and was acting within the course and scope of that employment, and under color of law. He is being sued in his individual capacity.

20. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 50 inclusive, are unknown to the plaintiffs, who therefore sue said defendants by such fictitious names. Defendants DOES 1 through 50, and each of them, were responsible in some manner for the injuries and damages alleged herein. Plaintiffs are informed and believe and thereupon allege that each of them is responsible for the injuries and damages alleged herein.

21. In doing the acts and/or omissions alleged herein, the defendants, including DOES 1 through 50, acted in concert and/or conspired with each of said other defendants herein.

## II. JURISDICTION AND VENUE

22. This action is brought pursuant to 42 U.S.C. §§ 1983, 1988 and 12132 and the Fourth and Fourteenth Amendments to the United States Constitution, made applicable to Defendants through the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a). This Court has further jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367 as those claims form part of the same case and controversy under Article III of the United States Constitution.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in the City and County of San Francisco, which is located in this district.

## CAROLINE DYER

24. On May 31, 2020, Plaintiff Caroline Dyer finished work around 6-7 pm. She then went with her boyfriend and their friend/coworker to ride their bicycles to downtown San Francisco. The Plaintiff and her company were looking for the George Floyd protest that they had heard was taking place that evening.

25. The Plaintiff made a sign out of cardboard on her break at work that read "I can't breathe". The Plaintiff felt overwhelmed by sadness, anger and confusion following George Floyd's murder and wanted to find people feeling the same way she did and have their voices be heard.

26. The Plaintiff rode down Market Street toward Embarcadero and found Market Street, lined with police officers. Market Street appeared to be closed off to traffic. She saw a group of around 80 protesters marching down Market toward Embarcadero and quickly began walking with them chanting, "No justice no peace!". After about 30-45 minutes of this, the group was split up by officers approaching the Plaintiff and the group of protestors head-on.

27. The Plaintiff, her boyfriend and their friend went around the block and eventually found the group of protesters again, heading up Sutter Street, it was around 8pm. The Plaintiff was walking her bike on her right side, walking up the street when she noticed San Francisco police lined up in front and behind her, blocking her in on Sutter street.

28. The Plaintiff found herself separated from her boyfriend and friend, and had stopped to look at all the officers and take it all in. She was in shock and experiencing disassociation.

29. The Plaintiff's boyfriend emerged from the chaotic crowd to tell her he had been shot in the arm and they had to go. The Plaintiff yelled a few times "No justice, no peace!" to the group of officers lined on the street and then with one hand on her bike and one hand in the air, walked as quickly as possible up the street attempting to leave the scene.

30. The Plaintiff made sure not to run and not to appear as a threat. Before she knew it, everyone was running and screaming, and the Plaintiff turned around to see that she was being chased by multiple officers.

31. The Plaintiff yelled out "I'm wheeling my bike, I have one hand up, please don't hurt me, I'm not a threat". Plaintiff looked back again to see officer 622 Shaw gaining on her.

32. Officer Shaw was less than 10 feet behind the Plaintiff when they made eye contact. The Plaintiff was still walking and looking over her right shoulder and she saw Shaw aim a rubber bullet projectile weapon at the Plaintiff and shoot.

33. The Plaintiff felt an immense amount of pressure and pain on her right upper, outer thigh, where she was shot.

34. After the Plaintiff was shot, Officer Shaw used his leg to trip Plaintiff, hitting her front shin bone, and grabbed the back of Plaintiff's head, pushing her very aggressively, while tackling her to the ground and getting on top of the Plaintiff.

35. The left side of Plaintiff's face was slammed to the ground, causing all of her ear piercings (4) to begin to bleed profusely.

36. The Plaintiff lost her headband, and had her hair in pigtail braids; an officer pulled Plaintiff from her braids from behind. Multiple other officers joined in and dog piled on top of Plaintiff as she screamed and panicked.

37. The Plaintiff was in shock and beginning to black out from stress and previous trauma, triggering her PTSD. Plaintiff was then handcuffed and seated on the side walk.

38. The Plaintiff was asking all the officers to explain what she had done, and why was she being detained, and no one answered.

39.  A few of the officers spoke back to the Plaintiff, one calling Plaintiff a "little bitch". The officers searched her backpack and took everything out of her pockets. After a while (around 10-11 pm), the officers grabbed the Plaintiff and put her into the big police van.

40. The Plaintiff told the officers that she had to urinate and the officers said "tough luck". The Plaintiff then urinated on herself out of fear.

41. The Plaintiff was in zip-tie handcuffs and was in excruciating pain as they were on very tight, cutting into her circulation. The Plaintiff was losing feeling in her hands.

42. The Plaintiff was brought to the county jail on Bryant Street where she was asked to join a group of other protesters sitting outside the building, all not wearing masks. The Plaintiff

told San Francisco Deputies that she wanted to wear a mask and was baffled by no one else wearing a mask.

43. The Deputies said fine, and then put Plaintiff somewhere to sit by herself. The Deputies told Plaintiff that she could either take a COVID test or be in solitary confinement. Plaintiff agreed to the COVID test. The Plaintiff asked the doctor swabbing her nose if they'd take a look at her injured leg that had been shot and he said no. It was nearing 1 am on June 1st as they brought Plaintiff into the building and after about 30 minutes of waiting in a cell alone, told Plaintiff to change into orange jail clothing.

44. The Plaintiff was being watched by three women deputies while she undressed and they told her to squat and cough. The Plaintiff informed the deputies that she suffers from PTSD and do not want to be watched while undressing and that this situation was highly triggering for her. One of the deputies said, "you should've thought about that before getting yourself in jail now, bitch".

45. The Plaintiff began crying and was still begging for medical attention. Walking, sitting, standing, Plaintiff's leg was in the most amount of pain she had ever felt. By this time, the Plaintiff's leg wound had swollen up to the size of a softball. The Plaintiff was put into a room with about three other females and waited about an hour to be given any booking information or able to use the phone.

46. The Plaintiff repeatedly asked to be seen by a doctor and was ignored each time. The Plaintiff was then put into another cell with one other woman and kept there overnight until around 10am on June 1, 2020, when deputies told her that she was going to be seen by a judge shortly.

47. The Plaintiff asked for ice for her wound and was told no. Plaintiff is a vegetarian and has been for six years. Plaintiff asked for food that she could eat, a banana or an apple or slice of bread and was told no and given a ham sandwich and milk.

48. The Plaintiff also let multiple deputies passing by her cell know that she was on medication for her anxiety and OCD and will suffer from electrical shocks and migraines if she doesn't take it. They failed to call the nurse for hours and even when they did, the nurse told Plaintiff that there was nothing they could do, and that the paperwork would take too long.

49. Around the early evening Plaintiff was brought upstairs to the area where other women were settled and in bunk beds.

50. Around 11pm on June 1st, Plaintiff was told that she was going to be released and around 1:20-2:30 am on June 2nd, Plaintiff was brought to collect her personal things and was released and given a notice to appear on June 4, 2020.

51. On June 4, 2020, Plaintiff showed up to court and was told that her case had been dismissed.

**HUNTER SANDOVAL**

52. On 5/31/2020 Plaintiff Hunter Sandoval was skateboarding down Beale St. towards Market St. about one block ahead of the (peaceful) Black Lives Matter march that he had been participating in.

53. As Plaintiff was going down Beale St. He observed about 10 Motorcycle police officers near the intersection of Beale St. and Market St.  so the Plaintiff non-violently /silently/peacefully stood in front of the motorcycle police that were clearly present to stop the protest at the intersection of Beale St. and Market St.

54. Plaintiff looked at a motorcycle officer in the front of the police line and the officer looked at the Plaintiff, and after about 5-10 seconds this officer drove his motorcycle straight into the Plaintiff. At the same moment another police officer dismounted his motorcycle and grabbed Plaintiff and threw him onto the ground with significant force, then both officers started to punch Plaintiff, pin him into the ground with their body weight and step on his penis and twisted his foot to cause the Plaintiff great pain.

55. The Plaintiff started to scream for help as he was extremely scared and injured. The Plaintiff was subsequently handcuffed and placed in a black SUV by the police officers.

56. Once the Plaintiff had been forced into the back of the car, officers took him away from the march to an unknown location and forced Plaintiff up against a van and stripped him of his belongings (during this time period, an officer cut Plaintiff's camera strap and smashed his camera on the ground, destroying it), the Officers also tightened the Plaintiff's cuffs to the point where his arm was losing circulation and began to feel numb. The police officers then threw the Plaintiff back into the van and would not tell him what he was being charged with, or why he had been apprehended.

57. The Plaintiff told the officers multiple times that he was in extreme pain because of the tight-fitting cuffs and his other injuries, and he was ignored by the officers. Plaintiff was ultimately taken to the police station and was placed in a cell to await court the next day. Around 8-9pm that day the Plaintiff was told that he was going to be discharged and he was released at around 1am.

## MUNICIPAL ALLEGATIONS

58. The City and County of San Francisco has policies and customs of violating the freedom of expression of persons who protest police brutality, and of using excessive force against such protesters and falsely arresting such protestors.

59. Throughout these protests, hundreds of peaceful protestors who were in no way engaged in violent or destructive behavior were indiscriminately beaten, shot be less lethal projectiles weapons and falsely arrested by San Francisco police. These foreseeable constitutional violations were made possible and in fact were authorized and encouraged by SFPD's lack of any written policy whatsoever governing or guiding this conduct. This lack of written policy resulted in the arbitrary and punitive application of this conduct against citizens peacefully assembled in lawful protest.

60. This failure is compounded by the fact that no tracking system exists to determine when, where, why, and how teargas is deployed by San Francisco police officers. As such any oversight or review of the conduct engaged by the Defendants will rely exclusively on records generated by the very officers who engaged in this conduct in the first place.

61. SFPD has no tracking system to determine which officers used less-lethal munitions, or even how many projectiles were expended against protestors. SFPD has a policy which makes the use of less-lethal projectiles potentially anonymous, relying on each officer to self-report when such munitions are used. In the absence of such a report (an entirely foreseeable event in instances of excessive or punitive force) SFPD has no way to track which projectiles were used by which officers under what circumstances. This encourages and leads directly to the indiscriminate use of potentially lethal force against peaceful protestors.

62. It is entirely foreseeable that police officers acting on their own with no policies to guide them in the face of anti-police protests would deploy teargas punitively against those protestors. Despite this patently obvious risk, SFPD unleashed angry, untrained, overworked, and unbridled officers in riot gear upon peaceful men, women, and children exercising their constitutionally protected rights. These tactics are not used on any protestors save those with a message critical of the police.

63. The City and County of San Francisco has failed to train and/or has inadequately trained its police officers in the use of less-lethal projectiles and the use of other excessive force. This is demonstrated in part by the fact that officers are aiming potentially deadly devices at protestors when they do not pose a threat of harm to officers or anyone else. The consequences of this lack of training are plainly obvious. This is further demonstrated by the widespread use of teargas without documentation or accountability in instances that could never justify its deployment.

## CAUSES OF ACTION

**COUNT One: [Fourth Amendment/Excessive Force, 42 U.S.C. 1983] by Plaintiff Caroline Dyer against Defendant Shaw and DOES 1-50; By Plaintiff Hunter Sandoval against Defendants McEachern, Richins, Olson, Curry, Chea, Korte, Chin**

***Caroline Dyer***

64. Plaintiffs restate and re-allege all previous paragraphs 1-63 of the complaint.

65. Defendants Shaw and Does 1-50, acting of color of law, violated the Plaintiff Caroline Dyer's clearly established rights to be free from excessive and unreasonable force as guaranteed by the Fourth Amendment, and as outlined herein.

66. Plaintiff Caroline Dyer's Fourth Amendment rights were violated when she was

deliberately, unjustifiably, and specifically targeted with a less lethal projectile fired at her by Defendant Shaw and after the Plaintiff was shot, Shaw used his leg to trip Plaintiff, hitting her front shin bone, and grabbed the back of Plaintiff's head, pushing her very aggressively, while tackling her to the ground and getting on top of the Plaintiff, causing all of her ear piercings (4) to begin to bleed profusely.

67. That officers, DOES 1-50 joined in and piled on top of Plaintiff as she screamed and panicked.

68. That despite the Plaintiff s repeated requests asking all the officers to explain what she had done, and why was she being detained, no one answered.

69. That the Plaintiff was placed in zip-tie handcuffs and was in excruciating pain as they were on very tight, cutting into her circulation. The Plaintiff was losing feeling in her hands. That despite Plaintiff's repeated request that the zip-ties be loosened because they caused her pain, her requests were ignored by the Defendants.

70. That Plaintiff had not committed any criminal acts, was unarmed, was not attempting to flee or escape and did not pose any threat of harm to any police officer or anyone else.

71. Defendants Shaw and Does 1-50, acting of color of law, violated the Plaintiff Caroline Dyer's clearly established rights to be free from excessive and unreasonable force as guaranteed by the Fourth Amendment, and as outlined herein.

### ***Hunter Sandoval***

72. Plaintiff Hunter Sandoval's Fourth Amendment rights were violated when Defendant McEachern deliberately, unjustifiably, drove his motorcycle straight into the Plaintiff. At the same moment Defendant McEachern dismounted his motorcycle and grabbed Plaintiff and threw him onto the ground with significant force, then Defendant with the assistance of Defendants

Richins, Olson, Curry, Chea, Korte, Chin started to punch Plaintiff, pin him into the ground with their body weight and step on his penis and twisted his foot to cause the Plaintiff great pain.

73. That Plaintiff had not committed any criminal acts, was unarmed, was not attempting to flee or escape and did not pose any threat of harm to any police officer or anyone else.

**COUNT Two: [Fourth Amendment/False Arrest, 42 U.S.C. 1983] by Plaintiff Caroline Dyer against Defendant Shaw and DOES 1-50; By Plaintiff Hunter Sandoval against Defendants McEachern, Richins, Olson, Curry, Chea, Korte, Chin**

***Caroline Dyer***

74. Plaintiffs restate and re-allege all previous paragraphs 1-73 of the complaint.

75. Defendants Shaw and Does 1-50, acting of color of law, violated the Plaintiff Caroline Dyer's clearly established rights to be free from unreasonable seizure as guaranteed by the Fourth Amendment, and as outlined herein.

76. Plaintiff Caroline Dyer's Fourth Amendment rights were violated when she was deliberately, unjustifiably detained and ultimately placed under arrest.

77. That Plaintiff had not committed any crime and the Defendants did not have probable cause that the Plaintiff had committed any crimes.

78. That the Plaintiff was not free to leave.

***Hunter Sandoval***

79. Defendants McEachern, Richins, Olson, Curry, Chea, Korte, Chin, acting of color of law, violated the Plaintiff Hunter Sandoval's clearly established rights to be free from unreasonable seizure as guaranteed by the Fourth Amendment, and as outlined herein.

80. Plaintiff Hunter Sandoval's Fourth Amendment rights were violated when he was deliberately, unjustifiably detained and ultimately placed under arrest.

81. That Plaintiff had not committed any crime and the Defendants did not have probable

cause that the Plaintiff had committed any crimes.

82. That the Plaintiff was not free to leave.

83. Said Defendants' misconduct caused Plaintiffs to suffer serious injuries and damages, including general, non-economic damages and economic damages to be determined according to proof. WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**COUNT Three: [*Monell* and Supervisory Liability - Fourth Amendment/Excessive Force, 42 U.S.C. 1983] By all plaintiffs against Defendants City and County of San Francisco and Chief Scott**

84. Plaintiffs restate and re-allege all previous paragraphs 1-83 of this Complaint.

85. Plaintiffs were seized when officers intentionally used unreasonable force by way of "less-lethal" projectiles and the use of punching, kicking, slamming Plaintiffs to the ground and using tight fitting handcuffs. .

86. Plaintiffs were unlawfully detained and falsely arrested, whereas the Defendants had not probable cause that the Plaintiffs had committed any crime and the Plaintiffs were not free to leave.

87. Defendants' officers and agents, under color of law, committed these acts without justification or warning, and as a result, these acts were objectively unreasonable and constituted unlawful seizures and excessive force.

88. Plaintiffs did not pose a threat to any of the defendants' officers, agents or any other person. Plaintiffs did not participate in riotous acts, looting, or the destruction of property.

89. It was San Francisco's custom and policy, as well as their failure to train and supervise their officers and/or issue corrective instructions after violations were brought to the City's attention, that caused the unlawful use of excessive force and false arrest.

90. San Francisco's failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiffs, including a failure to discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs. The pattern of similar constitutional violations against Plaintiffs that occurred during these protests demonstrates the deliberate indifference of San Francisco to the rights of Plaintiffs.

91. Further, given the pattern and practice of constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that San Francisco demonstrated their deliberate indifference to the constitutional rights of Plaintiffs by failing to provide such training and supervision, regarding the conduct stated above attributed to the Defendant officers.

92. As a foreseeable result of the constitutionally deficient policies and practices of the City of San Francisco, the Plaintiffs suffered injuries and damages as alleged herein. WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**COUNT Four:** *[Monell* **and Supervisory Liability/Ratification, 42 U.S.C. 1983] By all Plaintiffs against Defendants City and County of San Francisco and Chief Scott**

93. Plaintiffs restate and re-allege all previous paragraphs 1-92 of the complaint.

94. The acts of Defendants as stated above deprived Plaintiffs of their rights under the Fourth Amendment to the United States Constitution as outlined above.

95. Defendant Chief Scott had final policymaking authority from Defendant City and County of San Francisco concerning the acts and/or failures to act of Defendants' conduct.

96. Defendants Chief Scott and the City and County of San Francisco ratified the acts and/or failures to act of Defendants, in that they knew of these defendants' acts and omissions

leading to the violations of Plaintiffs' rights, and specifically made a deliberate choice to approve those acts and omissions and the bases for them.

97. The events leading up to and including the above-documented injuries to Plaintiffs were well known to the City of San Francisco Chief Scott, and the response from San Francisco Police Department was a department-wide response. As such there was no meaningful difference between what the Defendant officers were doing, and what the department itself was doing under the direction and with the encouragement of the City through Chief Scott. The acts and omissions of the Defendant officers occurred in realtime with the Chief's knowledge, encouragement, and consent.

98. At the time of this filing, no officers have been disciplined, placed on administrative leave, or retrained for any of the acts/omissions alleged herein.

(<strong>Negligence</strong>)

99. Plaintiff incorporates herein by reference the preceding paragraphs 1-98. of this complaint as fully set forth herein.

100. Defendant Officers owed Plaintiffs a duty of due care not to cause the Plaintiff to suffer excessive force/ battery, false arrest/ false imprisonment, unlawfully detained and that this duty was breached by the Defendants' negligence and failure to exercise due care in their handling of the Plaintiffs.

101. As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs were injured as set forth above and is entitled to compensatory damages according to proof at the time of trial.

102. Defendant Officers are liable for all injuries caused by their acts, to the same extent as a private person pursuant to California Government Code Section 820(a).

103. Defendants as public employees are not exonerated or immune from liability for negligence for causing the Plaintiff to suffer harm pursuant to California Government Code Section 820.8.

104. Because Defendants were acting as employees of San Francisco at the time of the incident, and because they were acting within the scope and course of their employment and under the direct control and supervision of San Francisco at the time of the incident, San Francisco is liable to the Plaintiff for negligence pursuant to California Government Code §815.2.

**(Battery)**

105. Plaintiff incorporates herein by reference the preceding paragraphs 1-104 of this complaint as fully set forth herein.

106. That based on above stated facts alleged in this complaint, all named Defendant San Francisco Police Officers, used unreasonable and excessive force on the Plaintiffs. (i) Plaintiffs had not committed any crime; (ii) Plaintiffs were unarmed; (iii) Plaintiffs did not pose any threat to defendant officers or bystanders; (iv) other alternative methods were available to effectuate a seizure.

107. As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs were injured as set forth above and is entitled to compensatory damages according to proof at the time of trial.

108. Defendant Officers are liable for all injuries caused by their acts, to the same extent as a private person pursuant to California Government Code Section 820(a).

109. Defendants as public employees are not exonerated or immune from liability for battery for causing the Plaintiff to suffer harm pursuant to California Government Code Section 820.8.

110. Because Defendants were acting as employees of San Francisco at the time of the incident, and because they were acting within the scope and course of their employment and under the direct control and supervision of San Francisco at the time of the incident, San Francisco is liable to the Plaintiff for battery pursuant to California Government Code §815.2.

**(False Imprisonment)**

111. Plaintiff incorporates herein by reference the preceding paragraphs 1-110 of this complaint as fully set forth herein.

112. That based on the facts alleged above in this complaint, the Defendant Officers, acting under color of law, unlawfully seized the Plaintiffs and caused them to be falsely imprisoned, by deliberately and intentionally confining them within a bounded area without probable cause that the Plaintiffs had committed any crime. (i) Plaintiffs had not committed any crime; (ii) Plaintiffs were confined by the actions of Defendant Officers; (iii) Defendant Officers intended to cause the Plaintiffs' confinement when they caused them to be placed in handcuffs and placed under arrest; (iv) Defendant Officers did not have probable cause to arrest the Plaintiff (v) The Plaintiff was aware of this confinement and was not free to leave.

113. As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs were injured as set forth above and is entitled to compensatory damages according to proof at the time of trial.

114. Defendant Officers are liable for all injuries caused by their acts, to the same extent as a private person pursuant to California Government Code Section 820(a).

115. Defendants as public employees are not exonerated or immune from liability for false imprisonment for causing the Plaintiffs to suffer harm pursuant to California Government Code Section 820.8.

116. Because Defendants were acting as employees of San Francisco at the time of the incident, and because they were acting within the scope and course of their employment and under the direct control and supervision of San Francisco at the time of the incident, San Francisco is liable to the Plaintiff for false imprisonment pursuant to California Government Code §815.2.

## (BANE ACT VIOLATION)

117. Plaintiffs incorporate herein by reference the preceding paragraphs 1-116 of this complaint as fully set forth herein.

118. Defendant Officers interfered with Plaintiffs' Fourth Amendment rights to be free from the unlawful use of force on their person.

119. That upon observing Defendants violating their constitutional rights, the Plaintiffs reasonably believed that if they exercised their right to be free from these violations that the Defendant Officers would commit violence against them.

120. That Defendant Officers injured the Plaintiffs to prevent them from exercising these rights.

121. That Plaintiff was harmed by this conduct and;

122. The Defendants' conduct was a substantial factor in causing their harm.

123. Because Defendants were acting as employees of San Francisco at the time of the incident, and because they were acting within the scope and course of their employment and under the direct control and supervision of San Francisco at the time of the incident, San Francisco is liable to the Plaintiffs for a Bane Act Violation pursuant to California Government Code §815.2.

## V. PRAYER FOR RELIEF

Plaintiffs pray for judgment against defendants as follows:

1. For compensatory damages and other special damages according to proof;

2. For general damages according to proof;

3. For punitive damages against all individual defendants according to proof;

4. The prejudgment interest at the legal rate according to proof;

5. For costs and reasonable attorneys' fees as provided by law; and

6. For such other relief as the Court may deem fit and proper.

## VI. JURY DEMAND

Plaintiffs demand a jury trial in this action.

LAW OFFICE OF STANLEY GOFF

Dated: July 11, 2021                    _____/s/ STANLEY GOFF_____
                                        STANLEY GOFF
                                        Attorney for Plaintiffs